PENNSYLVANIA R. CO. v. HICKEY.

(Circuit Court of Appeals, Third Circuit.   January 12, 1914.)

No. 1799.

1. MASTER AND SERVANT (§ 286*)—ACTION FOR INJURY TO SERVANT—NEGLIGENCE OF MASTER—QUESTION FOR JURY.

A car heavily loaded with pig iron and having no brake was moved from where it stood on the "cripple" track in defendant's yards to another yard at a considerable distance and there left standing on an inclined track. A block was placed under a wheel, but in taking up the slack to uncouple the engine the jar, although not unusual, caused the car to override the block, and it ran down the grade and struck and killed plaintiff's intestate, who was a brakeman in the yard. The reason ior moving it in its defective condition was not shown, but the movement was made by direction of the yardmaster, and the conductor in charge testified that he did not know the car had no brake. Held, that the proximate cause of the injury was the defective condition of the car, that the duty of controlling and safeguarding its movement was a primary duty of the master, which the defendant could not delegate, and that under the evidence whether it was negligent in causing such movement, and especially without advising the person in charge of the defective condition of the car, was a question for the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1001, 1006, 1008, 1010–1015, 1017–1033, 1036–1042, 1044, 1046–1050; Dec. Dig. § 286.*]

2. MASTER AND SERVANT (§ 289*)—ACTION FOR INJURY TO SERVANT—CONTRIBUTORY NEGLIGENCE.

Deceased, with three others, was engaged in reeling a fire hose on the switch engine when the car approached. Two of the others, who were on either side of him, got off the track. The third climbed into the cab, and deceased was following him when he was struck. Held, that the question of his contributory negligence was properly submitted to the jury.

[Ed. Note.—For other cases, see Master and Servant, Cent. Dig. §§ 1089, 1090, 1092–1132; Dec. Dig. § 289.*]

In Error to the District Court of the United States for the District of New Jersey; John Rellstab, Judge.

Action at law by Catherine Hickey, administratrix of John H. Hickey, deceased, against the Pennsylvania Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Theodore Strong, of New Brunswick, N. J., for plaintiff in error. Geo. S. Silzer, of New Brunswick, N. J., for defendant in error.

Before GRAY, BUFFINGTON, and McPHERSON, Circuit Judges.

GRAY, Circuit Judge. This writ of error is brought by the Pennsylvania Railroad Company, defendant below, to reverse a judgment recovered against it in the district court of the United States for the

district of New Jersey, by Catherine Hickey, widow and administratrix of John H. Hickey, deceased, in a suit for damages for the death of her husband, alleged to have been caused by the negligence of the defendant company.

The suit was removed from the circuit court of Middlesex county, New Jersey, to the United States District Court for the District of New Jersey, on the ground of diversity of citizenship, the defendant being a corporation of the state of Pennsylvania and the plaintiff a citizen and resident of the state of New Jersey.

As disclosed by the record, plaintiff's intestate, John H. Hickey, on November 25, 1907, was crushed to death in defendant's freight yard, at Waverly, New Jersey, between a locomotive engine, known as the "Oak Island" engine, and a runaway gondola car.

Deceased was employed by defendant and had been for about three months then past, and also on prior occasions, and at the time of the accident was a brakeman and member of the crew of the "Oak Island" engine, which seems to have been what is called a "yard" engine.

The engine had come up a few moments before the accident from what is known as the ash pit, where a fire drill had been engaged in by its crew, and stopped for the purpose of stretching the hose used in the drill across the main freight tracks to dry and reel it. The engine lay partly on the pit track or switch and partly on one of the main freight tracks, known as No. 10, across the frog that united the two tracks, thus blocking the latter track in part. The hose, 30 feet long, which was attached to the engine at the reel box under the cab, about 5½ feet from the ground, had all, except about 10 feet, been reeled in. Some time before, a gondola or platform car had been brought from what was known as the West Freight Yard of the defendant company, a considerable distance away from the East or Waverly Yard, where the Oak Island engine was employed and in which the tracks above referred to were situated. It had been taken off of a track in the West Yard, known as the Cripple Track, where crippled cars or cars needing repair are stored, by another engine and crew, and was about to be delivered to the crew of this Oak Island engine. When the car was brought by the engine onto the No. 10 track, it was stopped near the yardmaster's office, about 15 feet away from it, and at the top of what is known as the "hump" in that track, a moderate downward grade running from that point eastward toward the frog across which the Oak Island engine was lying, which was also headed in an easterly direction. The car, when it arrived at the "hump," was being pushed in that direction by the engine, which was west of it, so that there was nothing between the car on No. 10 track and the Oak Island engine lying across the junction of that track with the "pit track."

The car was entirely without brakes and presumably was on the cripple track, from which it was taken, for that reason. That was its condition when it stopped at the top of the hump, from which point it was to be allowed to descend by gravity down No. 10 track to the Oak Island engine and crew. It and the engine pushing it stood for a length of time not clearly indicated by the testimony. The conductor of this engine and crew having received orders from the No. 5, or yardmas-

ter's, office in the Waverly Yard to deliver this car to the Oak Island engine and its crew, ordered his own engine uncoupled. To do this, the engine had to be pushed slightly towards the car to loosen the pin, in order to allow the brakeman to withdraw it. Before this was done, the conductor ordered another brakeman to put the brake on the car, and the brakeman, already knowing or discovering that the car was without a brake, blocked or chocked it with a piece of wood 3"x4" in dimensions.

In making the uncoupling, the engine was pushed back, and in doing that, the impact caused the car to override the chock and to start down this No. 10 track towards the frog, over which the Oak Island engine was standing, some 386 feet away. There was evidence tending to show that one of the brakemen then jumped off of the car on which he was at the time, and that he and the other brakeman attempted to replace the block under the wheels as the car moved. This they did two or three times, at the same time shouting a warning to the four men grouped around the hose reel box under the cab of the Oak Island engine. The car, however, was heavily loaded with iron or steel billets, and the momentum being largely increased on that account, it overrode or knocked out of place the block each time it was placed under one of its wheels.

Brakeman Ader was nearest the oncoming car, with his back to it, winding the reel. Hickey, the deceased, was close beside him, facing the engine and holding the hose taut, as was necessary for the purpose of reeling it. Brakeman Fleming was about six inches further from the car than deceased, and the engineer, Hoesley, was nearest at hand. All who testified heard the warning. The engineer mounted the cab and crossed to the further side in an effort to get his engine out of the way, Ader and Fleming stepped back across No. 10 track, but the deceased, Hickey, with the hose in his right hand and holding it over his head, seized the grabiron on the engine with his left and started up the side of the cab after the engineer. A lift of six or seven feet would have accomplished his purpose, but he was too late and was caught between the oncoming car and engine and crushed so that he soon afterward died.

The plaintiff in her declaration alleges that the deceased came to his death by reason of the negligence of the defendant company, in permitting this loaded car to be moved on its tracks without a brake in the manner described.

After the conclusion of plaintiff's testimony, defendant moved for a nonsuit, on the ground that plaintiff had failed to show negligence on the part of the defendant. This motion was refused by the court and witnesses were called by the defendant. After the close of this testimony, counsel for plaintiff asked the court, on all the evidence, for binding instructions in favor of the plaintiff. This request was refused and the case was submitted to the jury with a charge from the court, and a verdict for $7,500 was rendered in favor of the plaintiff.

The assignments of error are 31 in number, apparently covering every exception to the admission or rejection of evidence, or to other matters, requiring to be made at the moment without opportunity for

reflection or the exercise of judgment. We think, however, every substantial question has been raised by the first assignment of error, founded on the exception to the refusal of the court to direct a verdict on the whole evidence in favor of the defendant. This has made necessary a careful examination of all the evidence disclosed by the record. Such questions involve the following contentions on the part of the plaintiff:

(1) That no negligence on the part of the defendant company has been shown;

(2) That if there was, John H. Hickey, the deceased, was guilty of contributory negligence;

(3) That the proximate cause of decedent's death was the act or omission of a fellow servant, and not of the defendant;

(4) That the accident was one of the risks of his employment.

[1] The crucial question, of course, is that of the negligence of the defendant, and whether the evidence was sufficient to require that question to be submitted to the jury. It is undisputed that a brakeless car, heavily loaded, was permitted by the management of the defendant company to be moved over a considerable distance and many tracks, from defendant's West Yard to what is known as the East or Waverly Yard. There is no testimony tending to show for what purpose this movement was made, except that of McCollum, one of the brakemen of the crew that picked up this car, and one of plaintiff's two witnesses to the accident. This witness, on cross-examination by defendant's counsel, in answer to the question, "What do you mean by Oak Island?" said, "The Oak Island engine was going to pick it up and set it down in the main yard, because it had no brake on it." Whether this knowledge was acquired after the accident or at the time the car was picked up, does not appear. It was not responsive to the question asked, and no attempt was made by defendant's counsel to show for what purpose or why the car was being moved in this obviously unsafe condition. So far as the evidence goes, it may have been moved for any purpose irrelevant to its condition. It was a heavily loaded car, and the purpose for which it was moved was left to conjecture. No explanation is offered by defendant as to why such a car unequipped with brakes should be sent this long distance down to the "main track." No attempt was made to show that it was necessary, in order to equip this car with brakes, to remove it from the cripple track on which it stood.

It would seem, therefore, that if the car were moved, or permitted to be moved, by the authority of the defendant under the circumstances which the evidence tended to prove, it was moved at defendant's risk of the consequences, of which its brakeless condition was the proximate cause. It is not disputed that the car was moved by direction given by the yardmaster at the West Yard to the conductor of the engine and crew that performed that operation. The order was to take the car down to No. 5 office, located near the classification tracks of the Waverly Yard. The conductor testifies, however, that this order was changed, presumably by the yardmaster of the Waverly Yard, and he was ordered to give the car to the Oak Island engine "when it came

down to the. pit." . The car was accordingly brought to the hump on No. 10 track and the engine was detached, in order that the car might go down the incline from the hump by gavity. We have aleady seen what happened when the engine was being detached, and the lamentable consequences which ensued from the inability to stop the loaded car in its progress down the incline.

As to the point raised by the defendant, that the proximate cause of the accident was not the brakeless condition of the car, but the force with which the engine was allowed to strike the car when being detached therefrom, and thus cause it to override the block under one of its wheels, a few words only need be said. There was evidence tending to show that pushing the couplings of the car and engine together, so as to slacken the hold on the pin and thus allow it to be withdrawn, was the usual method by which an engine, under the circumstances here disclosed, would be detached from the car. There is also evidence tending to show that the jar given to the car on this occasion was not extraordinary or more than was to be expected, although it may have been more than was necessary for the purpose of uncoupling. As one of the witnesses said, it is hard to regulate the precise force with which the engine takes up the slack. The evidence also tended to show that if the car had been equipped with a brake, it would have held the car, notwithstanding the jar given by the engine, and the testimony is positive that the conductor who controlled the movement of this engine and crew, when he gave the order to uncouple the same, did order the brakeman, McCollum, "to put the brake on," for the purpose of holding the car from going down the grade. The conductor never knew that the car was without a brake until after the accident, though the brakeman, McCollum, says that he (McCollum) did know that fact and therefore, when ordered to put the brake on, put the chock under the wheel.

This evidence certainly tended to show, if it did not positively show, that the proximate cause of the accident was the brakeless condition of the car. It was the extraordinary absence of the brake—not the ordinary conduct of the engineer in uncoupling—that in a legal, as well as common sense, point of view was the proximate cause of the accident. As to the crucial question of the defendant's negligence, it is to be observed that in a large way the proper conduct of the business of this railroad, and of this yard in particular, was the personal business of the master, while the ordinary and detailed operation of the road was in a large degree in the hands of subordinates, for whose shortcomings, if selected with due care, the master is not responsible.

Prima facie, this car standing on the "cripple track" used for the storage of disabled cars, or cars unfitted for transportation service or for movement on the tracks, should not have been moved at all, or certainly not for the considerable distance that it was moved, until brakes had been supplied. It may have been necessary for this car to be moved, in order to have its brakes restored, but if that were so, it would not be an ordinary operation, but an extraordinary one to so move it. It was not an operation in the regular conduct of transportation on the lines of traffic or in the classification or drilling movements

of railroad yards. Such a movement would require special safeguards to attend it and knowledge on the part of those controlling its movement, of the object thereof and of the disabled condition of the car. No explanation at all, however, was offered by the defendant company, as to why this car was moved. The purpose in that respect was left to conjecture. If the car was to be moved to some convenient place for repair, it would be natural that that purpose would be disclosed and the condition of the car consequently revealed. But, even had the purpose been shown, the remarkable testimony of the conductor of the crew that removed it from the "cripple track," shows an utter absence of that precaution and care which the one authorizing or permitting the movement should have exercised. On cross-examination, the conductor testified as follows:

"I didn't know there was no brakes on this car. Q. When you got to the top of the hill, you found that there was no brake on the car? A. No, sir. Q. You told Mr. McCollum to put the brake on? A. Yes, sir; I didn't know there was no brake on this car until after the accident. * * * Q. At the time you told this man to put the brake on, was there any brake there to put on? A. I didn't know then. I found afterwards that there wasn't any brake. * * * He was backing up the car and I told him to put the brake on, and I walked around the engine to throw the switch off. * * * Q. What was the purpose of your ordering him to put the brake on at that time? A. To keep it from going down the grade."

So we have this situation, that this heavily loaded and brakeless car was ordered to be moved a considerable distance, across from the West to the East Yard of the defendant company, and there to be placed at the top of an incline, where it was to descend by gravity, for no disclosed purpose relating to its disabled condition, and without informing the conductor of the crew who had charge of the movement that the car *was* disabled or without brakes. Assuming that McCollum, the brakeman, had knowledge of the condition of the car at the time the movement began, which he does not state, he did not communicate the same to his conductor. This certainly tended to show negligence in the direction of the movement, and we have no difficulty in deciding that the duty of controlling and safeguarding such a movement was a primary duty of the master, in this case the defendant company. This duty could not be avoided by its delegation to a yardmaster.

The long and well settled rule, that a master is primarily responsible for the safety of the places in which, and the conditions under which, his employés are required to work, needs no discussion; nor its corollary, that the master owes to his employés the duty of using reasonable care in the maintenance of such safe places and conditions, and that such duty cannot be so delegated by the master as to avoid responsibility for its proper performance. These rules eliminate all consideration of the care, or want of care, of the servant, of whatever grade or station, by whom and through whom the master performs this primary duty.

We think that the defendant company in this case was under the primary obligation of a master, in relation to any movement of such a car as this for a long distance over the crowded tracks of its freight yard, to use reasonable care to see that the places and conditions in

which and under which its employés were required to work were not rendered unsafe thereby. If the movement itself were permissible, the duty of the master was still more exigent as to the manner and conditions under which the movement was made, in order that such movement might not be a menace and danger to its employés. In this respect, it was pertinent for the consideration of the jury, that no necessity was shown by the defendant for the movement at all of this loaded car without brakes, and especially that the one to whose control the movement was committed was not informed of the dangers entailed by such movement by the absence of brakes. Moreover, it appears that this disabled car, by direction of the defendant, was sent to its position on No. 10 track in order that it might be sent down the hump or incline without the necessary means to control its movement. We have no difficulty in deciding that there was sufficient evidence tending to show negligence on the part of the defendant to go to the jury.

What we have already said disposes of defendant's point as to the proximate cause of the accident. As to the contention that the accident was occasioned by the negligence of fellow servants, it is only necessary to say, in addition to what we have said, that in the view we have taken of the master's duty, the yardmaster's negligence, if any, cannot relieve the liability of the master. As we have already seen, there is no evidence that the engineer, in slackening up for the loosening of the pin, gave any greater impact to the car than might ordinarily happen in such cases, or that he was better informed than the conductor as to the brakeless condition of the car. Of course, the yardmaster might, in some situations, be the fellow servant of the decedent, within the meaning of the general fellow servant rule, so that, in the absence of statute law abrogating the rule, for injuries resulting from his negligence the master would not be responsible, the fellow servant's negligence in such cases being one of the risks that an employé assumes upon entering the service. The negligence of the master, however, is never assumed as a risk inherent in the employment, and the yardmaster in this case represented the master as to one of the primary duties imposed upon him by law.

[2] It is contended that, however this may be, the decedent himself was guilty of contributory negligence, and that therefore this suit cannot be maintained by his administratrix and widow. A careful examination of the testimony in this respect convinces us that the court was right in refusing to affirm, as a matter of law, this proposition. Of the four members of the crew collected around the reel box under the cab of the Oak Island engine, all escaped except the decedent, but that fact is not sufficient to convict the decedent of contributory negligence. He was standing between two of the men, and he alone was occupied with the hose. That he waited a little too long, before attempting to escape, seems evident—whether trying to save the hose or disincumber himself from it does not matter, in the view we take of his conduct. Having miscalculated the closeness of the oncoming car, he attempted to escape by following the engineer up the steps of the engine, and before he had succeeded in reaching the space between the engine and tender, he was caught and killed.

We think the defendant has no reason to complain of the charge of the court in this respect. It is as follows:

"Of course, when I say that a man is chargeable with the exercise of carefulness to avoid injury, I mean to say it is that ordinary care which reasonably prudent persons exercise in like circumstances. A man is not chargeable when confronted suddenly with danger with the exercise of that kind of judgment while making his movements with which he would be chargeable in the absence of danger. The personal element must always be considered in that connection. It is your duty to consider the situation in which this man found himself at that time, and all the facts in the case which bore upon him when he was called upon to act. He is not to be charged with negligence merely because he was killed, but he is chargeable with negligence if he did not exercise that judgment which an ordinarily prudent person in like situation, confronted with the same exercise of judgment, would have exercised. If he failed to exercise that judgment he is guilty of contributory negligence. The evidence is that he was standing facing this engine, that he was between two men, one on either side of him. Those two men crossed the track immediately to the back of the deceased, and got out of harm's way. The fourth man, as I have said, the engineer, stood further away from Hickey, or nearer to the car, and got out of harm's way by going up the steps and getting into the cab. Hickey was crushed while standing on the steps leading to this cab. It is said that he, instead of being influenced by personal safety, was interested simply to save the hose; that he held the hose in his right hand and was clinging to the cab with his left hand, standing on the step, and that he was endeavoring to safeguard property rather than himself. Of course, if this man so disregarded his danger as not to take such steps as a reasonably prudent, careful man would take under such circumstances, taking the chance of getting on the engine, saving the company's property and not himself, that would be contributory negligence and the plaintiff could not recover, because that negligence which is imputed to him is imputed to her, and she cannot recover here. You must put yourselves, gentlemen, as nearly as the evidence will permit you, in the same place. Here were these four men, including Hickey, and if you conclude that this man could have gotten away if he had exercised proper care, you must then decide in favor of the defendant."

We think in this case the question of contributory negligence was, as ordinarily, a question for the jury and not for the court. The charge as a whole was eminently fair to the defendant, as was the conduct of the trial as disclosed by the record. Many of the other assignments of error have been covered by what has been said in regard to this fundamental one; the remainder are either without merit or disclose no harmful error.

The judgment of the court below is therefore affirmed.